# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

HEATHER KASAK,

          Plaintiff,

vs.

NANCY BERRYHILL,
Acting Commissioner of Social Security,

          Defendant.

No.  15-CV-0108-CJW

**MEMORANDUM OPINION AND
ORDER**

—————————————————

      Plaintiff, Heather Kasak (claimant), seeks judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying claimant's application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act).  For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    BACKGROUND

      Claimant was born in 1980, graduated from high school, and previously worked as an accounting clerk, in-home childcare provider, and advertising clerk.  AR 218; Doc. 11, at 4.  Claimant filed an application for DIB on July 31, 2012, alleging a disability onset date of May 4, 2012.  Doc. 11, at 1.  She contended she was disabled due to the following impairments: chronic fatigue syndrome; fibromyalgia; migraine headaches; depressive disorder; anxiety disorder; cognitive disorder, not otherwise specified; empty sella syndrome; Epstein-Barr virus; and orthostatic hypertension.  AR 61.  The Commissioner denied claimant's application initially and on reconsideration.  Doc. 11, at 1.

On February 4, 2013, claimant requested a hearing before an Administrative Law Judge (ALJ). Doc. 11, at 1. On February 13, 2014, ALJ Jo Ann L. Draper conducted a video hearing, at which claimant, claimant's attorney, Mary K. Hoefer, and a vocational expert testified. AR 59 & 81. On April 25, 2014, the ALJ issued a decision denying claimant's claims. AR 56-80. On August 5, 2015, the Appeals Council denied claimant's request to review. AR 1-4. The ALJ's decision, thus, became the final decision of the Commissioner. AR 1; 20 C.F.R. § 404.981.

Claimant filed a complaint in this Court on October 1, 2015, seeking review of the ALJ's decision. Doc. 2. With the consent of the parties, the Honorable Linda R. Reade transferred this case to a United States magistrate judge for final disposition and entry of judgment. The parties have briefed the issues, and on July 5, 2016, the matter was deemed ready for decision. Doc. 20.

## II.    *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 404.1505. An individual has a disability when, due to his physical or mental impairments, he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). If the claimant is able to do work which exists in the national economy but is unemployed because of inability to get work, lack of opportunities in the local area, economic

conditions, employer hiring practices, or other factors, the ALJ will still find the claimant not disabled. 20 C.F.R. § 404.1566(c)(1)-(8).

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 404.1520; *see Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity (SGA), then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial" work activity involves physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful" activity is work done for pay or profit, even if the claimant does not ultimately receive pay or profit. 20 C.F.R. § 404.1572(b).

Second, if the claimant is not engaged in SGA, then the Commissioner looks to the severity of the claimant's physical and mental impairments. If the impairments are not severe, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not severe if "it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see also* 20 C.F.R. § 404.1520(c); *Kirby*, 500 F.3d at 707.

The ability to do basic work activities is defined as having "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These abilities and aptitudes include: "(1) [p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) [c]apacities for seeing, hearing, and speaking; (3) [u]nderstanding, carrying out, and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers, and usual work situations; and (6) [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

Third, if the claimant has a severe impairment, then the Commissioner will determine the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) and the demands of her past relevant work. If the claimant can still do her past relevant work, then she is considered not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4). Past relevant work is any work the claimant has done within the past fifteen years of her application that was SGA and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b)(1). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation omitted); *see* 20 C.F.R. § 404.1545(a)(1). The RFC is based on all relevant medical and other evidence. 20 C.F.R. § 404.1545(a)(3). The claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Id.* If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv).

Fifth, if the claimant's RFC, as determined in Step Four, will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do given the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(f), 404.1520(a)(4)(v). The Commissioner must show not only that the claimant's RFC will allow him or her to make the adjustment

to other work, but also that other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make the adjustment, then the Commissioner will find the claimant not disabled. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the Commissioner has the responsibility of developing the claimant's complete medical history before making a determination about the existence of a disability. 20 C.F.R. § 404.1545(a)(3). The burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## III.    THE ALJ'S FINDINGS

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2017.

2. The claimant has not engaged in substantial gainful activity since May 4, 2012, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).

3. The claimant has the following severe impairments: chronic fatigue syndrome; fibromyalgia; migraine headaches; depressive disorder; an anxiety disorder; and a cognitive disorder, not otherwise specified (20 C.F.R. § 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in  20 § C.F.R. 404.1567(a) such that she is limited to lifting and carrying up to ten pounds occasionally and five pounds frequently. She could stand or walk two hours a day, and sit for six to eight hours a day.

She could only occasionally climb, balance, stoop, kneel, crouch, or crawl. She should have no more than occasional exposure to extreme heat, have no exposure to hazardous [sic], such as working around heights or moving machinery, and should never climb ladders, ropes, or scaffolds. She would be limited to tasks that could be learned in thirty days or less involving no more than simple, work-related decisions, with only occasional workplace changes.

6. The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on June 15, 1980, and was 31 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 4, 2012, through the date of this decision (20 C.F.R. § 404.1520(g)).

AR 61-74.

The parties filed a joint statement of material facts (Doc. 11), which the Court incorporates by reference. All of claimant's arguments before the Court relate to her Chronic Fatigue Syndrome (CFS). Thus, the Court briefly summarizes claimant's treatment history and her testimony concerning her CFS below.

Medical evidence

Claimant was treated on several occasions, by various medical professionals, both before and after her alleged disability-onset-date of May 4, 2012.

Claimant saw her family physician, Dr. Daniel Vanden Bosch, for a variety of reasons spanning from 2011 to 2012. Exhibit 3F. Dr. Vanden Bosch diagnosed claimant with depression. Doc. 11, at 5.

Claimant was treated by Dr. Arun Movva, from 2009 to 2012. Exhibit 4F. Dr. Movva's last finding, dated August, 1, 2012, stated that claimant is a "32 year old female with central adrenal insufficiency diagnosed in 3/09. MRI of the pituitary gland on 5/5/09 revealed a partially empty sella . . . . She continues to deal with fatigue, memory loss and dizziness" and "I frankly cannot think of any specific endocrine disorder that can explain her symptoms . . . . It would not be unreasonable to obtain evaluation at a tertiary care center like Mayo clinic or UIHC. I will leave the decision to her PCP [primary care physician]." AR 444-46. As of this date, Dr. Movva's clinic note listed claimant's active problems as: Chronic Fatigue Syndrome; Chronic migraine without aura, without mention of intractabl[e]; Hypogonadism; Malaise And Fatigue Nec; Organic Hypersomnia Idiopathic; and Secondary Adrenal Insufficiency. AR 444.

Claimant then saw Dr. Trisha Sheeley, an internal medicine doctor. Exhibit 3F. A radiology report signed by Dr. Sheeley dated July 2, 2013, found claimant's gastric emptying time was within normal limits. AR 374. On June 26, 2012, Dr. Sheeley's clinic note stated that claimant's "symptoms are consistent with chronic fatigue syndrome especially if she truly had a positive EBV after her diagnosis of mono. Unfortunately

there is no clinic here that specializes in this. Will consider referral to Mayo Clinic if needed. I have ordered several labs to be done." AR 367. Several of Dr. Sheeley's clinic notes state that claimant has "Chronic Fatigue Syndrome - diagnosis per Dr. Struthers (will see rheumatologist soon); developed after episode of mononucleosis." AR 359, 363, 365.

On July 9, 2012, rheumatologist Dr. Alan Braun saw claimant. Exhibit 2F. The clinic note from that visit, described claimant's self-described symptoms as well as her recent medical evaluation history. Dr. Braun wrote:

> Recent evaluation has included, in July of this year, a gastric emptying study that was normal, in June of this year, she had a cortisol stimulation test as well as a T4, B12, folate, urine porpyrins, heavy metal screen, and methylmalonic acid testing; all of which were normal. FSH and LH were normal as were CRP, electrolytes, ACTH, and CBC. In May of this year, she had an EGD with biopsies that showed gastritis as well as a complete metabolic panel and urinalysis that were normal. She had screening for celiac disease in May of 2009 that was normal . . . . She has been told in the past that she has Epstein-Barr virus infection. This was in 2000. She was told that she might have Lyme disease in 2001 on the basis of a positive Lyme serology . . . . More recently Lyme serologies have been normal. Other treatment has included "every antidepressant known to man." These have included among others, Effexor, Villbryd, Lexapro, Paxil, Seroquel, Zoloft, Wellbutrin, Celexa, Abilify, Cymbalta, and Savella. She has been on stimulants including Adderall, Ritalin, Provigil, and Nuvigil. She has been on hypnotics including Ambien, Lunesta, and Xyrem . . . . None of these treatments helped much except for the stimulants, which gave some mild benefit.

AR 341-42. Dr. Braun's clinic note continued with his "impressions" as follows:

1. [Claimant] meets the criteria for chronic fatigue syndrome
2. She also has fibromyalgia but I believe that to be part of the CFS
3. She has a history of "empty sella syndrome[.]" It isn't clear what extent of evaluation she has had for that . . . .

6. There is no other evidence of rheumatic disease including nothing to suggest a diagnosis of Lyme disease.

AR 343. Dr. Braun's same clinic note suggested evaluating claimant for "neutrally mediated hypotension with orthostatic BPs and maybe a tilt table test and/or EMG/NCV." AR 343. On July 23, 2012, a tilt test was conducted. AR 573-74, 636. The results were described as "[p]ositive tilt table test with mixed cardioinhibitory and vasodepressor response." AR 574.

On September 12, 2012, claimant saw Dr. Robert Struthers for a recheck. Exhibit 7F. Claimant complained of "headaches and idiopathic hypersomnolence." AR 559. Dr. Struthers' clinic note from that visit stated that claimant was weaned off of Adderall as it made her headaches more severe, and prescribed her Topamax again. AR 559-61. Overall, Dr. Struthers diagnosed claimant with migraine headaches and "idiopathic organic hypersomnia with long sleep time." AR 561.

Claimant also underwent a psychological evaluation by state consultant, Dr. Harlan Stientjes, in September of 2012. *See* AR 564-67. Dr. Stientjes found claimant to be: responsive, cooperative, could acceptably read, recalled the calendar date correctly, made five correct mathematical calculations in a sequence, capable of managing finances independently, and possessing an average general ability presumptively. AR 565-66. Overall, Dr. Stientjes found that claimant's "[p]rospects of return to gainful employment are weak despite some residual capacity." AR 566.

On November 6, 2012, Neurologist, Dr. E. Torage Shivapour, diagnosed claimant with CFS and fibromyalgia with "diffuse musculoskeletal pain/tenderness and chronic sleep disorder." AR 594; Doc. 11, at 7. He advised claimant to take 50 mg of Trazodone as a sleep aid and pursue physical therapy. *Id.*

On November 29, 2012, Dr. Sheeley wrote in her after visit summary that she will "continue to manage [claimant's CFS] conservatively." AR 580. Also, Dr. Sheeley

noted that claimant "has been to multiple specialist [sic]. All other evaluation has been negative." *Id.*

On December 18, 2012, at the request of Dr. Shivapour, claimant saw Dr. Joe Barrash for a neuropsychology consultation. AR 595-98. The clinic notes from the consultation state that claimant had intact comprehension, unremarkable thought processes, poor insight, depressed mood, intact judgment, and suboptimal effort during testing. *Id.*

On August 1, 2013, claimant saw Dr. Amal A. Shibil-Rahhal for evaluation of her adrenal function and empty sella syndrome. AR 611. Dr. Shibil-Rahhal's impression was:

> [Claimant] has undergone an extensive evaluation without any clear explanation for her symptoms. A couple of years ago, she was noted to have an empty sella an MRI [sic] but she clearly does not have hypopituitarism. The empty sella syndrome is a pure radiologic diagnosis simply indicating that the pituitary tissue is thin enough not to be clearly seen on MRI. It is typically not associated with pituitary dysfunction. No additional imaging for her pituitary is recommended. Concerning her adrenal function, there was no evidence of adrenal insufficiency. I obtained a random cortisol at around 4 PM today and it was normal at 15.4. In addition, the Cortrosyn stimulation test that she had done last summer was completely normal. Unfortunately, I do not have a clear explanation for the patient's symptoms, and there is no evidence of a hormone disorder to explain her symptoms. She may be interested in considering behavioral therapy to help her cope with her symptoms . . . . I will not schedule a followup appointment for Ms. Kasak to this clinic but would be happy to see her again should the need arise.

AR 613. Claimant also saw other medical professionals like Dr. Steven Mindrup (Exhibit 7F), psychologist Paul Sundell (Exhibit 20F), and Dr. William Talman (Exhibit 14F).

On February 25, 2014, Dr. Sheeley completed a Chronic Fatigue Syndrome Medical Source Statement. *See* AR 656-59. Dr. Sheeley wrote that claimant was

diagnosed with CFS, idiopathic hypersomnia, syncope, empty sella syndrome, and chronic migraine, and that these impairments have lasted or were expected to last for at least twelve months.  AR 656.  Dr. Sheeley also wrote that claimant has the following CFS symptoms: unrefreshing sleep, muscle pain, self-reported memory/concentration impairment, headaches, multiple joint pain without swelling, and post-exertional malaise exceeding 24 hours.  AR 657.  Furthermore, Dr. Sheeley wrote that claimant cannot handle a low-stress job, will be off-task 25% or more of the time, is limited in the weight she can lift, is limited in the amount of standing/walking/lifting that she can do.  In response to the question whether the claimant would need a job where she can shift at will from sitting/standing, Dr. Sheeley checked the "yes" box and also wrote "if able to work at all."  AR 658.  In response to the question whether the claimant would need to take unscheduled breaks, Dr. Sheeley checked the "yes" box and again wrote "if able to work at all."  AR 658.

Claimant's testimony[1] at hearing

At the hearing, claimant testified that her mother had moved into her home to "help" her with "[h]ousehold chores, taking care of the kids, getting them to and from school on time, and just moral support."  AR 87.  She also testified that her disability affects her driving ability and she had "two small accidents because I wasn't able to judge distance and the lights and the sounds and just concentrating."  AR 88.  She testified her doctor told her to limit her driving "only to when [she] was feeling very clear-headed."  AR 88.  She experienced fatigue after her first son was born.  AR 89.  She ran a daycare, but stopped in May of 2012 because "[i]t was simply too hard to care for the children

---

[1] Claimant's mother, Connie Miller, provided a third-party testimony, although not at the hearing.  The ALJ discredited her report by explaining that she is an interested witness and a non-medically trained individual unable to make accurate observations about frequencies, types, and degrees of medical signs.  AR 72.

and concentrate on everything and I was very ill with stomach problems and exhausted all the time." AR 89. She previously worked as an accountant at Hy-Vee. AR 90. She testified that her symptoms currently include: "[e]xhaustion, frequent headaches, and migraines, dizziness, memory problems, several stomach problems that require me to run to the bathroom frequently, and just an all over pain and sore and just not feeling well but more than that [inaudible]." AR 92. Furthermore, twice a week, she experienced severe migraine headaches where she needs to lie down for six to eight hours on such occasions. AR 100.

## IV.   THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit Court of Appeals explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (internal quotation omitted).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but we do not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (internal citation omitted). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir.

2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) (internal citation omitted) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## V.   DISCUSSION

Claimant makes three arguments in her brief. She argues that: "(1) ALJ erred in failing to consider SSR 14-1p and SSR 99-2p in evaluating Ms. Kasak's chronic fatigue syndrome; (2) ALJ erred in failing to consider whether Ms. Kasak's CFS medically

equaled the requirements of Listing 14.06B; and (3) ALJ erroneously discounted Ms. Kasak's chronic fatigue symptoms and the opinions of her treating doctors, for the primary reason that they were not fully supported by objective medical evidence." Doc. 16. The Court addresses these arguments below.

### A. Claimant Argues the ALJ Erred In Failing To Consider SSR 14-1p and SSR 99-2p In Evaluating Chronic Fatigue Syndrome

The Court here must determine (1) which ruling(s) apply to the ALJ's decision, and (2) whether the ALJ considered the appropriate ruling(s).

SSA rulings "have neither the force nor effect of law or Congressionally promulgated regulations." *State of Minn. v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) (internal quotation and citation omitted). Yet, "a court generally should defer to an agency's ruling . . . ." *Ingram v. Barnhart*, 303 F.3d 890, 894 (8th Cir. 2002) (citing *State of Minn.*, 151 F.3d at 748).

#### 1. Which ruling(s) apply to the ALJ's decision.

On the matter of which ruling(s) apply, claimant argues that both SSR 99-2p and SSR 14-1p apply. Doc. 16. Claimant argues that "[a]t the time of the ALJ decision, the relevant framework for evaluating CFS cases was SSR 99-2p. Shortly after the ALJ made her decision, and prior to the Appeals Council appeal, Social Security issued SSR 14-1p, which supersedes SSR 99-2p." Doc. 16, at 6. Claimant also states that despite asking the Appeals Council to consider both rulings, neither the ALJ's decision nor the Appeals Council decisions "mentions either of these two Rulings." *Id.* The Commissioner's brief fails to comment on this specific argument. Doc. 19. The Commissioner merely paraphrases claimant's argument above. Doc. 19, at 4. In claimant's reply brief, she states that the "Commissioner concedes that neither the ALJ nor the Appeals Council even mentioned these Rulings." Doc. 21, at 3. The Court finds

this is an overstatement as the Commissioner omission does not necessarily constitute a concession.

The Court disagrees with the claimant's characterization of when which ruling applied. Upon review, SSR 14-1p appears to be the relevant ruling for the ALJ's decision. The ALJ hearing was held on February 13, 2014. The ALJ issued her decision on April 25, 2014. According to the language of SSR14-1p itself, "[t]his SSR is effective on April 3, 2014." SSR 14-1p, 2014 WL 1371245 at *9 (Apr. 3, 2014) [hereinafter SSR 14-1p]. Thus, SSR 14-1p was effective twenty-two days before the ALJ issued her decision. SSR 14-1p also states that it "rescinds and replaces" SSR 99-2p. *Id.* at *1. Therefore SSR 14-1p,[2] and not SSR 99-2p, is the appropriate ruling that the ALJ should have considered to evaluate claimant's CFS.

### 2. *Whether the ALJ considered SSR 14-1p.*

Moving on to the second issue, the Court now examines if the ALJ considered SSR 14-1p in her analysis.

Claimant argues that under SSR 14-1p, "objective medical findings" sufficient to establish a medically determinable impairment (MDI) includes a positive tilt test showing neutrally medicated hypotension and an elevated antibody titer to Epstein-Barr virus. Doc. 16, at 6. Claimant alleges that the ALJ erred from Step Three through Step Five in her evaluation as she failed to apply SSR 14-1p. *Id.*, at 7. Specifically, the ALJ

---

[2] The requirements of evaluating CFS were substantially altered from SSR 99-2p to the newly effective SSR 14-1p. *See Wellenstein v. Colvin*, C-14-4043-MWB, 2015 WL 5734438, at *10 (N.D. Iowa Sept. 30, 2015) ("The ruling issues in 2014, SSR 14-1p, substantially changed the way the agency determined CFS, putting the initial burden on whether a medical source has diagnosed CFS."). *But see Mandler v. Colvin*, No. 2:13-cv-01636-GMN-GWF, 2015 WL 1443136, at *22 n.1 (D. Nev. Mar. 30, 2015) ("SSR 14-1p is substantially similar to SSR 99-2p.").

allegedly erred at Step Three by failing to consider Listing 14.06B as SSR 14-1p allegedly[3] instructs. *Id.* And claimant alleges the ALJ erred at Step Four and Step Five by "relying entirely on the lack of objective medical findings to discount both the claimant's symptoms and the treating doctor's opinion." *Id.*

Contrarily, the Commissioner argues that claimant's argument is "not an assertion of error," rather just a statement of facts. Doc. 19, at 5. The Commissioner also alleges that claimant confuses the rules "for how the ALJ should accept the diagnosis of CFS, with the rules for determining the functional impact of these diagnoses on a claimant's ability to perform work functions," and adds that claimant fails to prove her disabling functional restrictions by merely relying on her own subjective statements. Doc. 19, at 5-6.[4] Also, the Commissioner points out that here, unlike in the cases cited by claimant, there is no allegation of error at Step Two. *See e.g., Wellenstein v. Colvin*, C-14-4043-MWB, 2015 WL 5734438, at *8-12 (N.D. Iowa Sept. 30, 2015) (finding at Step Two, the ALJ erred to fully develop the record for CFS); *Jockish v. Colvin*, 5:15-CV-05011-KES, 2016 WL 1181680, at *5-6 (D. S.D. Mar. 25, 2016) (finding ALJ erred at Step Two to consider CFS).[5] Lastly, the Commissioner concludes that the ALJ properly examined the record and found that the treatment notes did not support Dr. Sheeley's

---

[3] The language of Listing 14.06B reads that "we will compare the specific findings in each case to any pertinent listing (for example, listing 14.06B in the listing for repeated manifestations of undifferentiated or mixed connective tissue disease) . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.06B. The Court discusses this listing in the next section.

[4] In claimant's reply brief, she argues that the Commissioner erroneously relies on SSR 82-58, which is no longer in effect, and that the Commissioner's summary of claimant's burden of proof is contrary to *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

[5] Claimant disputes this as well. *See* Doc. 21.

opinion or claimant's testimony regarding disabling functional restrictions from claimant's severe CFS. Doc. 19, at 7.

Claimant submitted additional evidence on appeal. Yet, as the Appeals Council properly stated, the additional evidence consisted of medical reports dated November 25, 2014, to April 15, 2015, and as such "[t]his new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before April 25, 2014 [date of ALJ's decision]. If you want us to consider whether you were disabled after April 25, 2014, you need to apply again." AR 2. Claimant also submitted a representative brief (Exhibit 16E) to the Appeals Council. AR 323-28. No additional evidence is at issue here. Thus, the record before the ALJ is the same record that the Court reviews.

The ALJ's decision was nothing if not thorough. Seven pages in the ALJ's decision are solely dedicated to reciting the claimant's medical history. *See* AR 64-70. The recitation of the non-medical evidence is also very thorough. *See* AR 71-72. Claimant takes issue with the ALJ's decision for failing to cite or reference SSR 14-1p. *See* AR 59-75. A citation or explicit reference to SSR 14-1p is, indeed, absent.

Yet, the Court finds that the ALJ's evaluation of the evidence on the record of claimant's CFS corresponded with the instructions set forth in SSR 14-1p. Thus, the ALJ's failure to directly cite SSR 14-1p in her opinion is a mere deficiency in her opinion-writing. *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) ("While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand.") (internal quotation marks and citations omitted); s*ee also Lewis v. Colvin*, 973 F. Supp. 2d 985, 1008 (E.D. Mo. 2013) ("The Eighth Circuit has held an arguable deficiency in opinion-writing technique does not require us to set aside an administrative

finding when the deficiency had no bearing on the outcome.") (quoting *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992)) (internal quotation marks omitted).

The Court now turns to SSR 14-1p, which is titled "Evaluating Claims Involving Chronic Fatigue Syndrome (CFS)." SSR 14-1p reads that "CFS *may* be a disabling impairment." *Id.* at *2 (emphasis added). The ruling states that "[w]e will find that a person has an MDI of CFS if a licensed physician diagnosed CFS, and this diagnosis is not inconsistent with the other evidence in the person's case record . . . . The evidence must document that the physician reviewed the person's medical history and conducted a physical exam." *Id.* at *4. Furthermore, the ruling cites to the Center for Disease Control and Prevention's definition of CFS, which is "a syndrome that causes prolonged fatigue lasting 6 months or more, resulting in a substantial reduction in previous levels of occupational, educational, social, or personal activities." *Id.* at *2. The ruling also states that the Social Security Administration (SSA) will document CFS generally with "longitudinal evidence." *Id.* at *5. Furthermore, the ruling explains that co-occurring conditions of CFS may include fibromyalgia, myofascial pain syndrome, migraines, and other enumerated conditions. *Id.* at *3. The ruling outlines the five sequential evaluation steps the SSA must consider to determine whether CFS is a MDI, including symptoms that should be considered, and whether CFS is disabling alone or in combination with claimant's other MDIs. *Id.* at *8-9.

Consistent with the instructions in SSR 14-1p at *8-9, the ALJ found the following at each of the five steps. At Step One, the ALJ found that claimant was not engaged in substantial gainful activity. AR 61. At Step Two, the ALJ found claimant's CFS was a severe MDI—consistent with the CFS diagnoses by doctors Sheeley (AR 361-67), Braun (AR 341-343), and Shivapour (AR 593-95). AR 61-73. The Court will discuss Steps Three through Five in subsequent sections. But briefly, at Step Three, the ALJ determined that that none of the listings were met by any impairment or the combination

18

of all impairments. AR 62-63. At Step Four, the ALJ found that claimant was precluded from performing past work but was able to perform sedentary work with the restrictions described above (*supra* Section III., 5). AR 63-73. And at Step Five, the ALJ found that there were jobs available in significant numbers in the national economy that claimant could perform. AR 73-74.

This disability decision corresponded with the instructions set out in the ruling. Here the ALJ discussed all of the evidence regarding claimant's CFS and relied on the medical diagnosis of CFS on the record to determine that claimant's CFS was a severe MDI at Step Two. The quality of the ALJ's decision here differs from many of the decisions dealing with CFS that have been remanded by the courts. *See Jockish,* 2016 WL 1181680, at *5-6 (remanded for ALJ's failure to consider CFS as a separate impairment at Step Two when the record reflected several physicians diagnosed CFS); *Reynolds v. Colvin*, No.8:14CV65, 2015 WL 134254, at *3-5 (D. Neb. Jan. 9, 2015) (twice remanded case—once by Appeals Council and once by court—for ALJ's failure to fully develop the record on the alleged impairments of fibromyalgia and CFS); *Wellenstein*, 2015 WL 5734438, at *9-14 (finding the ALJ failed to develop the record and failed to even consider the claim of CFS, thus the case was remanded back for the ALJ to develop the record on CFS and evaluate the CFS claim within the framework of SSR 14-1p); *Shontos v. Barnhart*, 328 F.3d 418, 424-25 (8th Cir. 2003) (remanded as ALJ made improper inferences from the medical record and relied on non-treating sources instead of on treating sources, thus not only did the ALJ did not consider the appropriate listings but acted contrarily to them). Thus, the ALJ's decision lacks the major deficiencies that characterize the cases listed above. *See Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) ("We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice . . . . An ALJ's decision is not outside the zone of choice simply because we might have reached a different

conclusion had we been the initial finder of fact.") (internal quotation marks and citations omitted).

Also, the ALJ included language in her decision that reflects an understanding and acknowledgment of the CFS specific ruling. In the decision, the ALJ writes that "[t]he claimant alleged disability due to chronic fatigue syndrome, headaches, and fibromyalgia symptoms, with the latter two thought to be related to the chronic fatigue." Interestingly, SSR 14-1p states that headaches are a symptom of CFS and fibromyalgia is a co-occurring condition of CFS.[6] SSR 14-1p, at *2-3. Also, pursuant to SSR 14-1p's mandate—"in cases in which a person with CFS has psychological manifestations related to CFS, we must consider whether the person's impairment meets or equals the severity of any impairment in the mental disorders listings"—the ALJ explicitly examined Listings 12.02, 12.04, and 12.06 for mental impairments. AR 62.

Lastly, "[t]o show an error was not harmless, [claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (citing *Van Vickle v. Astrue,* 539 F.3d 825, 830 (8th Cir. 2008)). Claimant alleges that the ALJ's failures—to consider Listing 14.06B and properly weigh claimant's testimony and Dr. Sheeley's opinion—stem from the ALJ's failure to consider SSR 14-1p. As will be discussed below, the Court rejects these arguments. The ALJ's findings were within her zone of choice and overall, the Court finds that substantial evidence on the record supports her decision to deny DIB. Thus, claimant fails to prove any indication that the ALJ would have granted her benefits absent the alleged failing to consider the ruling.

---

[6] As does its predecessor. *See* SSR 99-2p, 1999 WL 271569, at *3 n.3 (Apr. 30, 1999).

## B. *Claimant Argues that the ALJ Erred in Failing to Consider Listing 14.06B*

There is no specific listing for CFS. Thus, claimant argues that the ALJ failed to consider, at Step Three, whether her severe impairment of CFS, alone or in combination with her other severe impairments, met or medically equaled Listing 14.06B. Docs. 16 & 21. Claimant argues that the ALJ's failure to consider this listing requires reversal. Doc. 16, at 10.

Listing 14.06B, defines undifferentiated and mixed connective tissue disease as:

> B. Repeated manifestations of undifferentiated or mixed connective tissue disease,[7] with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
> 1. Limitation of activities of daily living.
> 2. Limitation in maintaining social functioning.
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.06B. Severe fatigue is defined as "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.00(C)(2). And malaise is defined as "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." *Id.*

---

[7] This listing "includes syndromes with clinical and immunologic features of several autoimmune disorders, but which do not satisfy the criteria for any of the specific disorders described. For example, you may have clinical features of SLE and systemic vasculitis, and the serologic (blood test) findings of rheumatoid arthritis . . . . Undifferentiated connective tissue disease is diagnosed when clinical features and serologic (blood test) findings, such as rheumatoid factor or antinuclear antibody (consistent with an autoimmune disorder) are present but do not satisfy the criteria for a specific disease. Mixed connective tissue disease (MCTD) is diagnosed when clinical features and serologic findings of two or more autoimmune diseases overlap." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.00 (D)(5)(a-b).

In her brief, claimant admits that she "does not have a connective tissue disease." Doc. 16, at 8. Claimant argues "[h]owever, she has severe debilitating fatigue—a requirement of the listing." *Id.* Claimant further argues that "[a]s a result [of her debilitating fatigue], her daily activities, social functioning and concentration, persistence and pace are markedly impaired, as described in her testimony, the medical records, and Dr. Sheeley's written opinion." Doc. 16, at 8. Also, claimant cites *Brown v. Colvin* for the proposition that it is the ALJ's duty to determine if any listings are met in the first instance. Doc. 21, at 11 (citing *generally Brown v. Colvin*, No. 15-3001, 2016 WL 3361472, (8th Cir. 2016)).

The Commissioner argues that claimant fails to demonstrate that she has *at least two* of the constitutional symptoms or signs (involuntary weight loss, fever, malaise, or severe fatigue) as she only claims that she has debilitating fatigue. Doc. 19, at 8-9. And the Commissioner argues, even if claimant does have two of the symptoms/signs, she fails part two of Listing 14.06B because she failed to show that one of her symptoms/signs is at a marked level where it (1) limits her daily-living activities, (2) limits her social functioning, or (3) limits her ability to timely complete task due to problems with pace, persistence, or concentration. Doc. 19, at 9.

A claimant must show that her condition equals or meets all of the criteria of a listing. *See Deckard v. Apfel*, 213 F.3d 996, 997 (8th Cir. 2000) (citing *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995)). *See also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his [or her] impairment matches a listing, it must meet *all* of the specified medical criteria.") (emphasis in original); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (to meet burden of proof, claimant must present medical findings equal in severity to all criteria of listing). Overall, the listings "describe limited circumstances in which a claimant's impairment is so severe that the individual is categorically deemed disabled without further inquiry." *Douglas v. Comm'r*

*of Soc. Sec.*, No. 6:11-CV-00043, 2012 WL 5929322, at *3 (W.D. Va. Nov. 7, 2012), *report and recommendation adopted,* No. 6:11-CV-00043, 2012 WL 5941469 (W.D. Va. Nov. 27, 2012) (nonbinding).

Ruling 14-1p instructs ALJs to "compare the specific findings in each case to any pertinent listing (for example, listing 14.06B in the listing for repeated manifestations of undifferentiated or mixed connective tissue disease) to determine whether medical equivalence may exist." SSR 14-1p, at *8. Claimant states that she does not have a connective tissue disease (neither undifferentiated nor mixed). Thus, the Court struggles to understand how the claimant views this as a likely winning argument for reversal. Here, claimant must show in part one that the medical evidence shows that she has at least two of the following: severe fatigue, malaise, fever, or weight loss. Then in part two, claimant must show that one of these symptoms/signs is so severe that it limits (1) her activities of daily life, (2) limits her social functioning or (3) limits her ability to timely complete tasks due to issues in concentration, persistence, or pace.

While it is doubtful that the evidence on the record supports a finding of *two* symptoms/signs, the record does not support a finding that any one of these symptoms/signs is severe enough to result in a *marked* level of limitation in one of the three general areas of limitations. First, the record does not support a finding that claimant has at least two of: involuntary weight loss, fever, malaise, or severe fatigue. Although claimant did experience weight fluctuations, these were within a normal range according to various medical professionals on the record. AR 366 (dated June 26, 2012, weight is 110 pounds and claimant looks "well developed, well nourished"), AR 623 (dated March 4, 2013, weight was 123 pounds, BMI of 21.8), AR 612 (dated July 31, 2013, claimant's weight was 111 pounds and she "look[ed] healthy and comfortable"). There is no record of claimant having a fever. *See* AR 586 (during flu-like symptoms claimant did not experience chills or fever). The medical records reflect sporadic

episodes of claimant having a sore throat, chills and vomiting, wondering if she has CFS, but no mention of fever. AR 480, 484-86. The issues of severe fatigue and malaise are a closer call. The regulations define severe fatigue as causing "significantly reduced physical activity or mental function" and malaise as illness/discomfort causing "significantly reduced physical activity or mental function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §14.00(C)(2). The ALJ found that despite claimant's severe impairment of CFS and her other severe impairments, the claimant only had "mild difficulties in activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence or pace; and no episodes of decompensation." AR 62. Dr. Movva's treatment note from August of 2012 listed claimant's active problems as "malaise and fatigue." AR 444. Although claimant is diagnosed with a severe impairment of CFS, the Court notes that "severe" is understood differently than in Step Two. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.00(D)(12) ("Severe means medical severity as used by the medical community. The term does not have the same meaning as it does when we use it in connection with a finding at the second step of the sequential evaluation processes in §§ 404.1520, 416.920, and 416.924."). Indeed, the record supports that claimant does not have severe fatigue. *See*, *e.g.*, AR 487 (claimant looked tired but seemed alert and awake and was conversant); AR 561 (claimant was alert); AR 580, 584, 588-89 (claimant treated conservatively); AR 596 (speech was fluent, well-articulated, non-paraphasic); AR 612 (claimant looked healthy and comfortable); and AR 616 (alert and cooperative). Similarly, the record also does not support a finding of malaise. AR 366 (claimant appeared in no acute distress and was "[o]riented to time, place, and person, well developed, well nourished"); AR 343 (well-nourished and well developed, and in no acute distress). Even if, the record supported two or more symptoms/signs, it would not support a finding that any of these symptoms/signs were at a marked level of limitation. For daily living activities, claimant

testified that she got children ready for school, packed their backpacks, ensured they ate breakfast, did light housework (e.g., filled laundry baskets, put cereal bowls in sink), tried to do scrapbooking and looked at photos. AR 92-94. Medical records also reflect that claimant was able to manage finances independently and could read acceptably (AR 564-67). Regarding social functioning, claimant was found to be responsive, cooperative, polite, comprehension intact, conversant. AR 487, 564-67, 596. And for ability to complete tasks on time, claimant recalled the calendar date correctly, made five correct mathematical calculations in a sequence, thought processes were unremarkable, judgment was intact. AR 565-66, 596.

Thus, the record does not support a finding that claimant met the requirement for Listing 14.06B. *See Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (internal citations omitted) ("There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record."); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention listing 112.05E does not affect our review. 'Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion, as it does in this case.'") (quoting *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003)).

### C. Claimant Argues the ALJ Erred in Discounting Claimant's Testimony on the Severity of Her Chronic Fatigue Symptoms And Erred in Discrediting Dr. Sheeley's Report.

Claimant alleges the ALJ erred in discounting claimant's credibility regarding the severity of her CFS symptoms, and erred in giving Dr. Sheeley's CFS Medical Source Statement report little weight.

### *1. Claimant's credibility on her subjective complaints*

Claimant argues that the ALJ discounting of claimant's credibility regarding the severity of her CFS symptoms for lack of objective medical evidence, which claimant argues is the nature of an illness like CFS, was a reversible error. Doc. 16. Claimant also argued the ALJ erred because the ALJ failed to discuss all of the *Polaski* factors. Doc. 21.

The Court reviews the ALJ's credibility determination through an examination of the *Polaski* factors and the mandates of SSR 14-1p. Under the *Polaski* factors, an ALJ must consider the "claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) claimant's daily activities; (2) duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984). In *Lowe*, the Eighth Circuit Court of Appeals stated, "[t]he ALJ was not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (internal citation omitted). If the ALJ gives a good reason for discrediting a claimant's credibility, then the court will defer to the ALJ's judgment "even if every factor is not discussed in depth." *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001). The Court also notes that "[a]lthough the ALJ may disbelieve a claimant's allegations of pain, credibility determinations must be supported by substantial evidence." *Jeffery v. Sec'y of Health & Human Servs.*, 849 F.2d 1129, 1132 (8th Cir. 1988) (internal citation omitted). "Moreover, the ALJ must make express credibility determinations and set forth the inconsistencies in the record that lead him to reject the claimant's complaints." *Id.* "Where objective evidence does not fully support the degree of severity in a claimant's subjective complaints of pain, the ALJ must consider

all evidence relevant to those complaints." *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal citation omitted). In evaluating a claimant's subjective complaints of pain, an ALJ may rely on a combination of his personal observations and a review of the record to reject such complaints. *Lamp v. Astrue,* 531 F.3d 629, 632 (8th Cir. 2008). However, the ALJ may not solely rely on his personal observations to reject such claims. *Id.* Thus "[s]ubjective complaints can be discounted [by the ALJ], however, where inconsistencies appear in the record as a whole." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) (citing *Polaski*).

SSR-14-p provides the following guidance on credibility determinations:

IV. How do we evaluate a person's statements about his or her symptoms and functional limitations?  Generally, we follow a two-step process:
A. First step of the symptom-evaluation process. There must be medical signs and findings that show the person has an MDI(s) which we could reasonably expect to produce the fatigue or other symptoms alleged. If we find that a person has an MDI that we could reasonably expect to produce the alleged symptoms, the first step of our two-step process for evaluating symptoms is satisfied.
B. Second step of the symptom-evaluation process. After finding that the MDI could reasonably be expected to produce the alleged symptoms, we evaluate the intensity and persistence of the person's symptoms and determine the extent to which they limit the person's capacity for work. *If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities; medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.* We will make a finding about the credibility of the person's statements regarding the effects of his or her symptoms on functioning. When we need additional information to assess the credibility of the individual's statements about symptoms and their effects, we will make every reasonable effort to obtain available information that could shed light on the credibility of the person's statements.

SSR 14-1p, at *7 (emphasis added). The ALJ found claimant's statements concerning the severity of her MDIs was "not credible to the extent they are inconsistent with the above residual functional capacity assessment." AR 71. First, the ALJ discussed the inconsistent medical evidence on the record, where several medical professionals' treatment notes (both physical and neurological evaluations) revealed only normal testing results and did not support a disability finding. Exhibits 1F, 7F 12F, 14F. Dr. Struthers noted that claimant's headaches had improved with medication to only once a week (Exhibit 15F), which the ALJ found inconsistent with claimant's testimony at the hearing of daily headaches. AR 72. The ALJ also found cardiologist's treatment notes from April of 2013 (Exhibit 16F) stating that claimant is pursuing a conservative treatment and "has been managing her symptoms [of dizziness] on her own and has gotten to the point that she is able to go about her daily functioning" inconsistent with claimant's hearing testimony. AR 72, 627 (cardiologist's note stated that claimant continues to take Adderall for chronic daytime fatigue, but has stopped taking Florinef and midodrine). *See Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir. 2001) (finding it appropriate to consider a conservative medical treatment as a credibility factor). Furthermore, the ALJ noted claimant's history of not pursuing additional recommended psychotherapy treatment for her reactions to chronic stress as recommended by Joe Barrash. AR 72, 598. *See* AR 615 (Dr. Amal Shibil-Rahhal suggested behavioral therapy as way for claimant to cope with her symptoms). Here, the ALJ wrote "claimant's failure to follow treatment advice tends to suggest she was not experiencing symptoms consistent with those she alleged in connection with her application, eroding the credibility of those allegations." AR 72. Also, the ALJ considered all of claimant's reported daily activities, and determined that these were inconsistent with allegations of disabling limitations. AR 72. *See* AR 92-94.

Lastly, the ALJ also considered the testimony of claimant's mother. The ALJ found that her testimony lacked credibility as she was an interested third-party witness and lacked medical training, and overall her testimony was inconsistent with the weight of the medical evidence on the record. AR 72. Thus, the ALJ's credibility determination properly considered both the *Polaski* factors as well as the instructions provided by SSR 14-1p.

### 2. Weight given to Dr. Sheeley's Chronic Fatigue Syndrome Medical Source Statement report

Claimant asserts that the ALJ erred in discrediting the CFS Medical Source Statement dated February 2014 by Dr. Sheeley, claimant's treating physician.[8] *See* Docs. 16 & 21. Claimant argues the ALJ erred in rejecting Dr. Sheeley's report "because the medical testing that was performed in order to rule out causes *other than* chronic fatigue syndrome came back as normal or unremarkable." Doc. 16, at 19 (emphasis in original).

A *treating source* is an acceptable medical source who has an ongoing treatment relationship providing medical treatment or evaluation to the claimant; however, such relationship may not exist solely to establish claimant's disability. 20 C.F.R. § 404.1502. Under agency regulations, an *acceptable medical source* includes licensed physicians, either medical or osteopathic doctors. *Id.* § 404.1513(a). An ongoing treatment relationship is generally established when the medical evidence is consistent that the claimant has seen "the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." *Id.* § 404.1502. Generally, a treating source gets controlling weight. *See Goff*, 421 F.3d at

---

[8] The parties stipulated that Dr. Sheeley is claimant's treating source. Doc. 11, at 8.

790 (internal quotations and citation omitted) ("A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."). *See* 20 C.F.R. §404.1527(d)(2). But, a treating source's opinion does "not automatically control, since the record must be evaluated as a whole." *Id.* (internal citation omitted). Furthermore, there is a category of opinions, even if authored by treating sources, which get limited weight; namely, opinions by treating medical professionals stating that an applicant is "unable to work" or "disabled" do not count as medical opinions. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (citing *Stormo,* 377 F.3d at 806). An ALJ may give limited weight to a treating source's opinion if such opinion only provides conclusory statements or is inconsistent with the substantial evidence on the record. *Chamberlain v. Shalala*, 47 F.3d 1489, 1489-94 (8th Cir. 1995). *See Vandenboom v. Barnhart*, 421 F.3d 745, 749-50 (8th Cir. 2005) (upholding ALJ's decision to deny controlling weight to the treating source's opinion where such opinion was "based largely on [claimant's] subjective complaints with little objective medical support" and relied on a medical report inconsistent with the whole record); *see also Renstrom v. Astrue*, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (concluding ALJ's decision to give treating source non-controlling weight was reasonable as treating source's findings were "largely based on [claimant's] subjective complaints" and his findings were inconsistent with other medical experts on the record who found claimant capable of light work).

Under SSR 14-1p, medical opinions about a claimant's CFS impairment are weighed as follows:

> How do we consider medical opinions about a person's impairment? We consider the nature of the treatment relationship between the medical source and the claimant when we evaluate the source's medical opinions about a person's impairment(s). *If we find that a treating source's medical opinion regarding the nature and severity of a person's impairment(s) is well-*

> *supported by medically acceptable clinical and laboratory diagnostic techniques, and the opinion is not inconsistent with the other substantial evidence in the case record, we will give it controlling weight.* If a medical source states that a person is "disabled" or "unable to work," or provides an opinion on issues such as whether an impairment(s) meets or is equivalent in severity to the requirements of a listing, a person's residual functional capacity (RFC), or the application of vocational factors, we consider these statements to be opinions on issues reserved to the Commissioner. We must still consider such opinions in adjudicating a disability claim; however, we will not give any special significance to such an opinion because of its source.

SSR 14-1p, at *6 (emphasis added).

Applying the above standards, the Court finds that substantial evidence on the record as a whole supports the ALJ's decision to discredit Dr. Sheeley's report. In the report, most of Dr. Sheeley's statements refer to claimant's likely inability to work, and thus are classifiable as non-medical opinions, which only deserve limited weight. *See Stormo,* 377 F.3d at 806. Determinations of disability are within the sole discretion of the Commissioner. In the report, Dr. Sheeley opined claimant cannot handle a low-stress job, will be off-task 25% or more of the time, is limited in the weight she can lift, is limited in the amount of standing/walking/lifting that she can do. AR 657-58. In response to the question whether the claimant would need a job where she can shift at will from sitting/standing, Dr. Sheeley checked the "yes" box and also wrote "if able to work at all." AR 658. In response to the question whether the claimant would need to take unscheduled breaks, Dr. Sheeley checked the "yes" box and again wrote "if able to work at all." AR 658. As the Commissioner rightly points out, "unexplained checklist opinions are of limited value." Doc. 19, at 19 (citing *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)). Dr. Sheeley's report finding claimant's CFS likely makes her

unable to work and disabled, however, is not supported by Dr. Sheeley's overall treatment notes and findings. In November of 2012, Dr. Sheeley's treatment notes reflect that she was recommending only conservative treatment for claimant. AR 580 ("continue to manage [claimant's CFS] conservatively . . . . [claimant] has been to multiple specialist [sic]. All other evaluation has been negative."). Such treatment notes do seem inconsistent with Dr. Sheeley's findings that claimant's CFS is so severe that she cannot handle even a low-stress job, or will be off task for 25% of the time or more, and likely will not be able to work at all. *See Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) ("A treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion itself."). Dr. Sheeley's physical examinations revealed normal findings. Exhibits 3F (dated June 2012, overall physical findings were normal). The other medical evidence on the record supports discrediting Dr. Sheeley's report. *See* Exhibit 6F *(*Dr. Vanden Bosch's physical examinations also revealed normal findings); Exhibit 2F (treatment note by Dr. Braun dated July 2012, states that claimant's gastric emptying study was normal, cortisol stimulation test was normal, Lyme serologies were normal, and various other tests were all normal); and AR 613 (in April of 2013, Dr. Shibil-Rahhal found claimant's adrenal function and cortisol levels to be normal). Also, the ALJ's decision states "Dr. Sheeley continually reported being unable to assess the claimant's functioning in completing the checklist form, noting that she needed a disability evaluation. However, there is no indication such evaluation was performed." AR 70. Overall, the Court finds that substantial evidence on the record as a whole supports the ALJ's decision to discredit Dr. Sheeley's report.

## VI. CONCLUSION

After a thorough review of the entire record, the Court concludes that the ALJ's decision to deny claimant's application for DIB is supported by substantial evidence on

the record as a whole.  Accordingly, the Court **affirms** the decision of the ALJ.  Judgment shall be entered in favor of the Commissioner and against claimant.

      **IT IS SO ORDERED** this 20th day of March, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa